T.C. Memo. 1996-174


UNITED STATES TAX COURT


HARM DE BOER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11047-94.              Filed April 10, 1996.


Harm De Boer, pro se.

<u>James R. Robb</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION


BEGHE, <u>Judge</u>:  Respondent determined deficiencies in petitioner's 1990 and 1991 Federal income taxes of $5,263 and $6,322, respectively, and negligence penalties under section 6662 of $1,053 and $1,264, respectively.[1]  The deficiencies arose from

---

[1]Unless otherwise identified, section references are to the Internal Revenue Code in effect for the years in issue, and all

respondent's disallowance of net operating loss carryovers and Schedule C deductions claimed by petitioner in connection with his drill rig activities.

As a result of respondent's concession on an unrelated issue brought up by petitioner's amendment of his 1990 return, the only issues remaining for decision relate to the deficiency and penalty for 1991, viz:  (1) Whether petitioner, in 1986, was engaged in a trade or business under section 162, so as to be entitled to a $25,547 net operating loss carryover from 1986; (2) whether petitioner, in 1991, was entitled to deduct expenses of $6,471 as (a) ordinary and necessary trade or business expenses under section 162 or (b) expenses "for the management, conservation, or maintenance of property held for the production of income" under section 212(2); and (3) whether petitioner is liable for a negligence penalty under section 6662.

We hold: (1) Petitioner was engaged in a trade or business in 1986; (2) petitioner (a) was not engaged in a trade or business in 1991, but (b) did incur expenses in connection with property held for the production of income within the meaning of section 212; and (3) petitioner is not liable for a negligence penalty under section 6662.[2]

---

Rule references are to the Tax Court Rules of Practice and Procedure.

[2]See appendix for rulings on evidentiary objections.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein.

When petitioner filed his petition, he resided in the vicinity of Fairbanks, Alaska.

Petitioner has a degree in petroleum production engineering. Prior to beginning a drilling business in 1978, petitioner spent approximately 20 years in the petroleum industry as a drilling engineer.

The First Drill Rig

In December 1978, petitioner purchased a used Hughes Auger drill rig for $76,181 and commenced a drilling business that he called "De Boer Drilling Co."[3]  Petitioner's rig, rather than being used to drill for oil, was used to drill large diameter foundation support holes for construction projects, as well as the holes needed to start oil wells.  During the years 1978 through 1981, petitioner operated the drill rig on a contract basis for oil companies and construction companies on the north slope of Alaska.  Petitioner performed drilling work for such oil companies as Alyeska Oil Co., Atlantic Richfield, and British

---

[3]The first drill rig is a Model TAP-50, approximately 12 feet wide and 70 feet long and weighing approximately 150,000 pounds.  This drill is capable of drilling to a depth of approximately 60 feet.

Petroleum, and such construction companies as Morrison Knudsen Corp. and Green Construction Co.

Petitioner had no employment other than the operation of his drilling business during 1978 through 1981. Over a 3-year period, 1979 through 1981, petitioner earned approximately $300,000 in revenues from his drilling business. Because of the short construction season and long Alaskan winter, petitioner's revenues were earned during a 1- to 2-month period in each of those years.

In September 1981, petitioner moved from Alaska to Stavanger, Norway, to accept employment as a drilling engineer for Mobil Oil Co. on the North Sea. Petitioner continued to work overseas as a Mobil employee until May 1985. From 1981 through 1984, petitioner returned to Alaska 4 to 6 weeks each year; during these visits he worked on his drill rig and corresponded with potential clients. With the exception of a 1-week rental of the drill rig in 1982, petitioner received no revenue from De Boer Drilling Co. while he was employed by Mobil.

The Second Drill Rig

In May 1985, soon after completing his employment with Mobil, petitioner returned to Alaska. In June 1985, petitioner purchased at auction, for $50,000, another used drill rig that had an original list price of $650,000, and the capacity to drill

deeper than the first rig.[4]  Petitioner also purchased diesel and electric welding equipment for $3,500.  Later during the year, petitioner purchased "Inner Kelly" equipment for use with the recently purchased rig, at a cost of $30,962.

Although the second drill rig was in working order when purchased by petitioner, he spent substantial time and money renovating it, and keeping it in working order.  From the end of May 1985, through the beginning of July 1987, petitioner had no employment other than his drilling operation, and devoted the bulk of his waking hours working on the drill rig and looking for jobs on which he could use it.  Notwithstanding that petitioner engaged in wage-earning employment after July 1987 for various employers (see infra p.7), he continued to spend substantial time on activities under the name "De Boer Drilling Co."  Petitioner spent approximately 80 percent of this time working on the drill rig and 20 percent looking for drilling jobs.

For the purchase price and capital costs of work done on the second drill rig from 1985 through 1989, petitioner claimed cost recovery deductions of approximately $88,000.  Petitioner also claimed expense deductions for De Boer Drilling Co. of approximately $113,000 during 1985 through 1991.  During this

---

[4]The second drill rig is a Hughes Tool Co. Model TAP-120T, also approximately 12 feet wide and 70 feet long, and weighing approximately 150,000 pounds.  This rig is capable of drilling holes from 18 inches in diameter to 120 inches in diameter and can dig efficiently to a depth of 120 feet.

period, petitioner filed Federal income tax returns, identifying his occupation as "drilling contractor", with Schedule C forms identifying the principal service as "drilling services," and the business name as "De Boer Drilling Co."  For the years 1985 through 1991, petitioner reported gross receipts, expenses, and losses for De Boer Drilling Co., as follows:

| Tax Year | Gross Receipts | Expenses | Depreciation[5] | Net Profit (Or Loss) |
|---|---|---|---|---|
| 1985 | -0- | $16,752 | $23,957 | ($40,709) |
| 1986 | $2,148 | 20,987 | 27,973 | (46,812) |
| 1987 | 8,280 | 12,834 | 25,356 | (29,910) |
| 1988 | -0- | 12,092 | 24,739 | (36,831) |
| 1989 | -0- | 31,994 | 17,738 | (49,732) |
| 1990 | -0- | 12,112 | -0- | (12,112) |
| 1991 | -0- | 6,471 | -0- | (6,471) |

Petitioner's net loss for 1986 was shown on his 1986 return as a net operating loss, for which he claimed a carryover deduction in 1991.

The gross receipts shown above for 1986 and 1987 resulted from sales of metal well casing purchased by petitioner for

---

[5]Petitioner was still claiming depreciation deductions on the first drill rig (on a straight-line basis over 10 years) during this period.  Depreciation deductions claimed by petitioner with respect to the first drill rig and other equipment purchased during the period 1978-81 and the second drill rig and related equipment purchased in 1985 are as follows:

| Tax Year | First Drill Rig | Second Drill Rig | Total |
|---|---|---|---|
| 1985 | $9,514 | $14,443 | $23,957 |
| 1986 | 7,618 | 20,355 | 27,973 |
| 1987 | 5,618 | 17,738 | 23,356 |
| 1988 | 7,001 | 17,738 | 24,739 |
| 1989 | 0 | 17,738 | 17,738 |

$6,535 in September 1978, and on which he had claimed depreciation deductions for the years 1978 through 1985. Petitioner had no other receipts or gross income from De Boer Drilling Co. for the years 1985-91. Petitioner received and reported wages in the following amounts on his Federal income tax returns from 1985 through 1991:

| Tax Year | Wages | Employer | Dates Worked | Hrs./Wk. |
|---|---|---|---|---|
| 1985 | $89,555 | Mobil Exploration Norway, Inc. | 1/1-5/20 | 50 |
| 1986 | 7,254 | Mobil expense reimbursement | | |
| 1987 | 14,228 | U.S. Army | 7/11-10/30 | 35 |
| | | Everts Air Fuel | 12/1-12/31 | 35 |
| 1988 | 21,639 | Everts Air Fuel | 1/1-12/31 | 35 |
| 1989 | 20,285 | Everts Air Fuel | 1/10-6/10 | 35 |
| | | Craig Taylor Equip. Co. | 11/11-12/31 | 40 |
| 1990 | 31,894 | Craig Taylor Equip. Co. | 1/1-12/31 | 40 |
| 1991 | 36,332 | Craig Taylor Equip. Co. | 1/1-2/15 | 40 |
| | | University of Alaska | 2/26-12/31 | 38 |

In 1987, petitioner attempted to sell the second drill rig, and entered negotiations to sell it at a price of approximately $400,000. However, he did not sell it.[6]

During the years 1985-91, petitioner listed De Boer Drilling Co. in the Fairbanks, Alaska yellow pages under the heading "drilling contractors" at a cost of approximately $150 to

---

[6]There is no evidence in the record as to what petitioner did with the first rig after he bought the second rig, and all further references herein to "the drill rig" are to the second drill rig.

$200 per year. Petitioner also maintained business licenses, and submitted written proposals to provide drilling services to oil and construction companies during the relevant period. With the exception of written proposals in 1992 and 1993, petitioner did not retain written records of his efforts to find work for his drilling operation.

While petitioner used the drill rig to drill some holes on his own property,[7] he has never been able to obtain contracts to use the drill rig commercially for clients. Petitioner attributes his inability to obtain drilling business to a general depression in the level of economic activity in Alaska during this period, due to the decline in oil prices. Indeed, oil prices did decline sharply in 1986, and thereafter, through 1991, remained at substantially lower levels than they were at in 1984 and 1985.[8]

---

[7]The record does not disclose the nature of petitioner's property, which he characterizes as "commercial", and whether petitioner's drilling on the property was merely to test operative capabilities of petitioner's equipment or to benefit the property.

[8]Neither party asked the Court to take judicial notice of the decrease in oil prices or general economic activity that began in 1985. However, on brief and at trial, both parties referred to a decline in oil prices during the relevant period and appear to agree that it had a general depressing effect on the levels of construction and general economic activity in Alaska. Crude oil price summaries for the relevant periods are available, and we take judicial notice of them, under Fed. R. Evid. 201(a).

(continued...)

Petitioner is a skilled mechanic and engineer. His long hours of work on the drill rig, in the face of his inability to find work for it, are attributable both to the profit that he expected to earn from its operation and disposition and the enjoyment he derived from working on the equipment, upgrading it, and keeping it in a state of readiness.

Petitioner reported taxable income of $35,354 and a tax liability of $7,774 on his Federal income tax return for 1985. However, foreign tax credits arising from petitioner's foreign source income from his work overseas reduced that liability to zero. Petitioner reported no taxable income and a tax liability of zero on each of his Federal income tax returns for the period 1986 through 1991.

---

[8](...continued)
The largest decline in the spot price of crude oil occurred in 1986, and the price never recovered during the relevant period to 1984-85 levels.

Selected domestic prices per barrel follow:

| Year | Price |
|---|---|
| 1984 average | $25.88 |
| 1985 average | 24.09 |
| 1986 average | 12.51 |
| 1987 average | 15.40 |
| 1988 average | 12.58 |
| 1989 average | 15.86 |
| 1990 average | 20.03 |
| 1991 average | 16.54 |

Energy Information Administration/Historical Monthly Energy Review 1973-1992, at 249.

Petitioner's 1985-89 Federal income tax returns were examined by respondent. The examination resulted in petitioner's receipt, in March 1992, of respondent's no-change report and letter with respect to his 1989 reported income and deductions.

OPINION

Section 162 allows as a deduction all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business. Section 172(d)(4) allows section 162 deductions in excess of gross income to be carried forward as a net operating loss for 15 years following the taxable year of the loss. Section 167 provides, in part, for depreciation deductions with respect to property used in a trade or business.

Respondent determined that petitioner did not engage in the drilling business during the taxable years 1986 and 1991 with the intent to earn a profit. Respondent disallowed the deductions in 1991 attributable to petitioner's drill rig activity, maintaining that petitioner was not in business in 1986, and that petitioner's drilling equipment was not in business use in 1986 or 1991.

Respondent concedes that if petitioner was engaged in business in 1986, he incurred a net operating loss of $25,546 that he can carry forward to 1991, the year before us, without regard to his later trade or business status and the proper

treatment of the losses he claimed for the intervening years 1987-90. If petitioner was engaged in the drilling business in 1986, the net operating loss carryover taken as a deduction in 1991 was proper, because the loss would have been incurred in the operation of a trade or business. See, e.g., Swisher v. Commissioner, 33 T.C. 506, 510 (1959).[9]

Respondent maintains that the business begun by petitioner in 1978 ended in 1981 when petitioner accepted overseas employment, and that, upon returning from Norway, petitioner began a new activity that never became a trade or business. Petitioner maintains that his business continued from 1978 through 1991 and thereafter, and that his purchase of and work on the second drill rig and efforts to obtain contracts for its use were a continuation of his preexisting business.

> It is sometimes necessary to decide whether a taxpayer has terminated his business (so that expenditures to reenter the area are not incurred in "carrying on" the business) or has only suspended business activities temporarily, in which event the taxpayer's status continues for purposes of Section 162(a). [Bittker &

---

[9]Respondent, in her notice of deficiency, determined that petitioner was not engaged in business in 1986 and therefore disallowed the net operating loss from that year. Respondent did not determine alternatively that, even if petitioner was engaged in a trade or business in 1986, he was not engaged in business in the intervening years 1987 through 1990. It would follow, if petitioner was not engaged in business or income production during the intervening years, that petitioner's income from these years would have absorbed the net operating loss from 1986, leaving nothing to be carried forward to 1991. Respondent did not make this argument, and we do not address it.

Lokken, Federal Taxation of Income, Estates and
Gifts, par. 20.1.6, at 20-19 (2d ed. 1989)].

## Issue 1.  Whether Petitioner Was in a Trade or Business in 1986

Expenses incurred in a trade or business are generally fully deductible.  However, an activity must be engaged in for income or profit in order to constitute a trade or business. Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).  This requires the taxpayer to have an "actual and honest objective of making a profit."  Ronnen v. Commissioner, 90 T.C. 74, 91 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982) affd. without pub. op 702 F.2d 1205 (D.C. Cir. 1983).  The taxpayer may have a bona fide objective of making a profit, even if the expectation of profit is not reasonable.  Hulter v. Commissioner, 91 T.C. 371, 393 (1988); Allen v. Commissioner, 72 T.C. 28, 33 (1979); Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. without published opinion 607 F.2d 995 (2d Cir. 1979), affd. on another issue 615 F.2d 578 (2d Cir. 1980).  Whether a taxpayer has the requisite actual and honest objective of making a profit is a question of fact to be resolved on the basis of all of the facts and circumstances of the particular case.  Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Dunn v. Commissioner, 70 T.C. at 720.  The taxpayer bears the burden of proof on this issue.  Rule 142(a).

Viewing the record as a whole, we believe that petitioner, in 1986, had a bona fide intention to derive a profit from his drilling activity.  Petitioner had operated a successful drilling business in 1978 through 1981, prior to accepting employment in Norway at the end of 1981.  In the taxable years 1979 through 1981, petitioner earned approximately $300,000 in revenues from his drilling business.  Although the record contains no direct evidence of petitioner's profits in 1979-81, the gross revenue that he earned in these years must have generated profits.  The existence of such profits can be inferred from the levels of annual expenses in later years for which we do have evidence.

Because petitioner's drilling operation from 1978 through 1981 had been successful, he reasonably believed that drilling work would be available upon his return to Alaska in 1985.  Cf. sec. 183(d).  The fact that a drop in oil prices coincided with petitioner's attempt to reactivate the business does not weigh against petitioner's profit objective in 1986, even if we were to conclude, in the light of hindsight, that petitioner's expectation of profitability was unreasonable in 1986.  Provided petitioner had a genuine expectation of profit during 1986, as we believe he did, the possibility or probability that it may have been or become objectively unreasonable does not gainsay our conclusion that petitioner was engaged in the activity for profit in 1986.  See Stahnke v. Commissioner, T.C. Memo. 1980-369.

Petitioner had worked full time in his drilling operation from 1978 through 1981.  From 1981 through 1984, during the period petitioner was working for Mobil, he returned to Alaska 4 to 6 weeks each year, during which time he worked on his drilling equipment and corresponded with potential clients.  In 1982, petitioner earned income from the use of his drill rig.

In 1986, petitioner had no outside employment and did no work other than his drilling activity.  Petitioner claims to have devoted 3,285 hours to his drilling operation in 1986, which amounts to more than 80 hours per week.  Even one-half of the hours claimed by petitioner would amount to a work week for the average individual during this year.

We deem it unnecessary to decide whether petitioner's drill rig activities in 1985-86 were a continuation or reactivation of his 1978-81 trade or business, or an attempt to start a new business, with the old business of 1978-81 having been terminated by petitioner's full time employment overseas with Mobil.  We conclude that, during the year 1986, petitioner engaged in the drilling activity for profit.  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987).

Respondent argues that the losses incurred by petitioner in both of the years at issue, as well as the intervening years, petitioner's lack of formal operating statements or records, and the recreational benefit derived by petitioner from his drilling

activity are indicative of petitioner's lack of profit objective in 1986.

We do not find petitioner's losses after 1986 indicative of his profit intention in 1986. In 1986, petitioner had reasonably expected continued success in the drilling business, based on his earlier success. Moreover, losses sustained because of unforeseen circumstances, which are beyond the control of the taxpayer, such as depressed market conditions, would not be an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. Petitioner maintains, and respondent does not dispute, that there was a decline in oil prices during the period at issue, which was largely responsible for the overall decline in construction and drilling activity throughout Alaska.

Respondent argues that petitioner's activity should have been unaffected by the decline in oil prices, because petitioner's drilling activity consisted only of foundation work for construction projects and oil companies. Respondent maintains that there was still a market for petitioner's services.

We find petitioner's argument more persuasive on this point. As the figure of speech, "if it's not broken, don't fix it", suggests, we believe that, when petitioner returned from Norway in 1986, he conducted his drilling activity in much the same way he had from 1978 through 1981, when he had earned large revenues

and substantial profits. Although there had been a market for petitioner's services in 1978 through 1981, the decline in oil prices in 1986 resulted in a general economic decline with a correlative reduction in construction activity during the period after his return to Alaska, which obviously had an adverse effect on petitioner's ability to obtain drilling contracts.

Petitioner admits that he enjoys working on his equipment. While petitioner's drilling activity included recreational and personal elements, we do not find that those aspects outweighed petitioner's profit objective. A taxpayer's enjoyment of an activity does not demonstrate a lack of profit objective if the activity is, in fact, conducted for profit as shown by other factors. Jackson v. Commissioner, 59 T.C. 312, 317 (1972); sec. 1.183-2(b)(9), Income Tax Regs.

Petitioner expended a great deal of money renovating his drill rig. We do not believe that petitioner would have embarked on such a time-consuming, costly, labor-intensive venture without a profit objective. The fact that petitioner derived a level of personal satisfaction from working on the equipment does not belie his underlying profit objective. Sec. 1.183-2(b)(9), Income Tax Regs.

Although petitioner's records of his drilling activities and efforts to find work for the rig left much to be desired, the absence of accurate books and records does not conclusively establish the lack of a profit objective. See Farrell v.

Commissioner, T.C. Memo. 1983-542.  We find petitioner's marketing efforts more indicative of his profit objective. Petitioner held himself out as a drilling contractor during the relevant period by listing his business in the telephone directory.  Also, petitioner submitted proposals to provide drilling services to oil and construction companies.  Petitioner actively sought contracts to use the drill rig commercially.

Finally, we consider petitioner's financial status. Petitioner is not a wealthy individual whose unprofitable drilling activity would suggest an effort to shelter unrelated income through deliberate losses.  While substantial income from sources other than the activity may indicate that the activity is not engaged in for profit, the fact that the taxpayer does not have substantial income from sources other than the activity tends to indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(8), Income Tax Regs.  The legislative history of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487 discloses a particular concern about wealthy individuals attempting to generate paper losses for the purpose of sheltering unrelated income.  See H. Rept. 91-413 (1969), 1969-3 C.B. 200, 244-245.  We have no such concerns with respect to petitioner, particularly with respect to the year 1986, when he had no wage income.  We do not believe that petitioner's intention in 1986, when he earned no wages, was to generate a large net operating loss that he could carry to a later period.  Petitioner's

financial status, combined with the substantial amount of money he expended in renovating the drill rig, weighs in favor of his profit objective.

We conclude that petitioner was engaged in a trade or business with regard to the drill rig during 1986, and is entitled to the net operating loss carryover deducted in 1991.

Issue 2(a). Whether Petitioner Was Engaged in a Trade or Business in 1991

Our finding that petitioner's activity constituted a trade or business under section 162 in 1986 does not warrant a finding that petitioner was engaged in a trade or business in 1991.

If an activity is one "not engaged in for profit", section 183(a) provides that "no deduction attributable to such activity shall be allowed", except as otherwise provided in section 183(b).[10] Petitioner has not persuaded us that he continued to be engaged in a trade or business during 1991.

Our finding is based on the manner in which petitioner carried on his activity from 1987 through 1990, including part of 1991. Because no one factor is determinative, we are most persuaded by petitioner's continued dependence on techniques that produced no revenue. While losses often occur during the

---

[10]First, sec. 183(b)(1) allows the full amount of those deductions available without regard to the profit objective of the activity. Then, sec. 183(b)(2) allows those deductions normally permitted only if such activity was engaged in for profit, but limits them to the amount by which the gross income from that activity exceeds any deductions taken under sec. 183(b)(1).

formative years of a business, "the goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years." Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965) affd. 379 F.2d 252 (2d Cir. 1967). Before going to Norway, petitioner's drilling activity had been successful. Thus, when petitioner returned from Norway in 1985, his expectation of continued success in the drilling business was bona fide. However, we simply are unable to impute a continuing profit objective to petitioner, when he continued the activity that had generated no revenue and incurred losses for a period of 6 consecutive years, without changing the manner in which he carried it on. Petitioner's continued lack of revenue and resulting losses year after year, coupled with his failure to change his approach or terminate the activity, supports the inference that, by 1991, he had become indifferent to whether the losing trend could be reversed. See Hendricks v. Commissioner, 32 F.3d 94 (4th Cir. 1994) affg. T.C. Memo. 1993-396.

While each case is unique, and we are not willing to place a strict length-of-time requirement on when an activity is no longer carried on for profit, we do not think that the profit objective petitioner had in 1986 could have continued through

1991.  We sustain respondent's determination that petitioner was not engaged in a trade or business in 1991.

Issue 2(b).  Whether Petitioner's Activity Was Engaged In For Profit Within the Meaning of Section 212

Having concluded that petitioner was not engaged in a trade or business under section 162 in 1991, we consider whether, in 1991, petitioner was engaged in an activity for the production of income under section 212.  While both sections 162 and 212 allow a deduction for ordinary and necessary expenses, section 162(a) requires that the expenses be paid or incurred in carrying on a trade or business, whereas section 212 requires only that the expenses be paid or incurred for (1) the production or collection of income, Tybus v. Commissioner, T.C. Memo. 1989-309, or (2) "the management, conservation, or maintenance of property held for the production of income", sec. 212(2).

Expenses paid or incurred in managing, conserving, or maintaining property held for investment may be deductible under section 212 even though the property is not currently productive. Sec. 1.212-1(b), Income Tax Regs.  Section 212 was designed to allow deductions for certain nontrade or nonbusiness expenses. Lykes v. United States, 343 U.S. 118 (1952).

The Supreme Court first interpreted section 212 in Bingham's Trust v. Commissioner, 325 U.S. 365 (1945).  While the Court in Bingham's Trust stressed the parallelism between sections 212 and 162, it held that deductible expenses need not relate directly to

the production of income for the business.  Instead, the effect of section 23, the predecessor to section 212, was to provide for a class of nonbusiness deductions that were incurred in the production of income or in the management or conservation of property held for the production of income.  Id. at 373-374.  The Court rejected the Commissioner's claim that expenses can be deducted under section 23 only if they produce immediate income.[11]

Respondent does not dispute that the expenses listed on petitioner's tax return were paid by petitioner.  However, in her statutory notice of deficiency, respondent maintains that no deduction is allowable because petitioner had not placed his drill rig into business use.  Under Bingham's Trust, petitioner did not need to place his drill rig into business use in 1991 in order to be entitled to deductions for expenses incurred in maintaining his drill rig, as long as he had a profit objective with respect to its ultimate disposition.

Petitioner has expended substantial amounts of money, time and effort in the renovation and maintenance of his drill rig.

---

[11]See also Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 20.5.1, at 20-104 (2d ed. 1989).  Bittker & Lokken suggest that the "nonbusiness" label for sec. 212 purposes is simply an abbreviated way of referring to profit-oriented activities that are not sufficiently frequent and continuous to be a trade or business.  Thus, it follows that sec. 162 allows deductions for expenses incurred in a trade or business, while sec. 212 allows deductions for expenses incurred in maintaining an income-producing asset.

The taxpayer may hope to derive a profit from an activity, and may intend that, even if no profit is derived from current operations, an overall profit will result when appreciation in the value of property used in the activity is realized. Sec. 1.183-2(b)(4), Income Tax Regs.

Although petitioner's work on his drill rig was a source of personal satisfaction, a drill rig would hardly qualify as a recreational vehicle. Profit objective is to be determined on an objective basis. Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). A drill rig drills holes in the ground for purposes of starting wells or foundations of improvements to real property. Thus, we do not characterize a drill rig as a recreational vehicle, as we would a motorcycle or sports car. Section 1.212-1(b), Income Tax Regs., provides in relevant part, that the term "income" includes income that the taxpayer may realize in subsequent taxable years, and is not confined to recurring income, but applies as well to gains from the disposition of property. We thus find that, during 1991, petitioner's drill rig was property held for the production of income within the meaning of section 212.

Petitioner maintains that his drill rig has a present value of $500,000 to $750,000. The value of a capital asset is a function of the stream of income that it can produce, and petitioner has failed to produce any revenue through the use of the drill rig. Nevertheless, we are persuaded that the expenses

incurred by petitioner in 1991 were "ordinary and necessary" in helping to maintain the appreciated value of petitioner's drill rig, whose original $50,000 basis had been reduced to zero by depreciation deductions allowed.

Respondent questions the reasonableness of petitioner's estimate of value, particularly because petitioner did not present appraisals or expert testimony of the value of the drill rig. Petitioner testified, however, that he was in negotiations to sell the drill rig in 1987 for approximately $400,000. Even a lesser increase in value would still provide petitioner with a substantial profit, without the benefit of depreciation deductions. See Lemmen v. Commissioner, 77 T.C. 1326, 1343 (1981). Even though petitioner's opinion regarding the value of his drill rig may be overly optimistic, there appears to be some substantial likelihood that petitioner will eventually realize some profit from the sale of the drill rig. We thus find that petitioner has proven his intention to realize a profit from the time and effort expended on maintenance of the drill rig, at least with respect to its ultimate sale. The lack of expert testimony regarding the value of the drill rig speaks only to the extent of its appreciation.

Respondent argues that petitioner did not "hold" his drill rig with the primary objective of making a profit. However, even if this were true, section 212(2) allows a deduction for expenses paid or incurred for the management, conservation, or maintenance

of property held for the production of income.  Respondent appears to assert that the objective of "making a profit" is the same as the objective of "producing income."  So restrictive an interpretation would be unwarranted.  The Code is replete with instances in which the expression "taxable income" is used to refer only to receipts remaining after deduction of expenses.  See, e.g., secs. 63, 161.  Hartford v. United States, 265 F. Supp. 86 (W.D. Wis. 1967)(expenses incurred in the maintenance of rental property were deductible under section 212, even though the expenses exceeded receipts from the rental).  Section 212 refers to property held for the production of income, not property held for the production of current taxable income.  Respondent cites no authority to support her view that "income" in section 212 is to be so limited to current taxable income.  Property held for the production of income does not require that the property be currently productive, but instead includes property held for the production of income from gain from its sale.  See Robinson v. Commissioner, 2 T.C. 305 (1943)(upkeep expense and depreciation deductions allowed on a vacant building that could not be currently rented).

In Ray v. Commissioner, T.C. Memo. 1989-628, we held that where a taxpayer claims to hold property for investment purposes, there must be some affirmative act on the part of the taxpayer to show that the property has been appropriated to an income-producing purpose.  Because the property at issue in Ray was real

property that had appreciated in value without any affirmative act by the taxpayer, we held that expenses incurred by the taxpayer were not expenses incurred for the management, conservation, or maintenance of property held for the production of income.

The case at hand is distinguishable from Ray.  We believe that petitioner's actions have caused his drill rig to appreciate in value.  A major purpose of petitioner in continuing to expend the time, money, and effort on maintaining the drill rig in 1991 was to enhance the likelihood of obtaining a return on his investment if and when he should subsequently sell the drill rig. We hold that all expenses listed on Schedule C, for the tax year 1991, which we find were attributable to the management, conservation, or maintenance of petitioner's drill rig, to be properly deductible under section 212.

Under section 67, in the case of an individual, the miscellaneous itemized deductions for any taxable year are allowed only to the extent that the aggregate of such deductions exceeds 2 percent of adjusted gross income.  Section 1.67-1T(a)(1)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 9875 (Mar. 28, 1988) provides the deduction under section 67 includes expenses for the production or collection of income for which a deduction is otherwise allowable under section 212(1) or (2). Thus, petitioner's allowable deduction for 1991 is subject to the

2-percent limitation of section 67, and account should be taken of the limitation in the Rule 155 computation.

## Issue 3.  Section 6662 Negligence Penalty

Respondent determined that petitioner is liable for a penalty for negligence pursuant to section 6662(a), (b)(1) and (c).  Section 6662(a) imposes a penalty of 20 percent of the portion of the underpayment to which section 6662 applies.  Section 6662(b)(1) provides a penalty for negligence or intentional disregard of rules or regulations.  Section 6662 defines "negligence" as including any failure to make a reasonable attempt to comply with the provisions of the Code.

Negligence is defined as the lack of due care or the failure to do what a reasonable and ordinarily prudent person would do under similar circumstances.  Anderson v. Commissioner, 62 F.3d 1266, 1271 (10th Cir. 1995), affg. T.C. Memo. 1993-607; Norgaard v. Commissioner, 939 F.2d 874, 880 (9th Cir. 1991), affg. in part and revg. in part on other grounds T.C. Memo. 1989-390. Petitioner bears the burden of proving that respondent's determination of negligence is erroneous.  Rule 142(a); Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991); Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972).

We have held for petitioner on the substantive issues of the net operating loss carryover from 1986 and the 1991 expense deductions, which remove both from consideration as a possible source of support for respondent's determination of negligence.

However, on his 1991 return, petitioner deducted the entire amount of expenses incurred in 1991 as trade or business expenses. We have determined that petitioner's deductions for 1991 are allowed only as expenses incurred in the production of income under section 212, subject to the 2-percent limitation imposed by section 67.

We find no affirmative evidence of negligence or disregard of the rules or regulations. We have found petitioner to be an intelligent and credible witness. Even a taxpayer well-versed in the Code requirements for carrying on a trade or business often encounters difficulty in determining what would satisfy the requirements. We find that petitioner was acting in reasonable good faith when he concluded that the items in question were deductible as trade or business expenses. Sec. 6664(c)(1); see Kasey v. Commissioner, 54 T.C. 1642 (1970), affd. per curiam 457 F.2d 369 (9th Cir. 1972).

While we have disagreed with petitioner's characterization of his expenses for 1991, and found his claims of business expense deductions to be incorrect, petitioner had a reasonable basis for his claims. After audit, petitioner received a no-change letter in March 1992 for the taxable year 1989, stating that petitioner's business deductions for that year were proper. Petitioner timely filed his 1991 Federal income tax return in April 1992, shortly after receipt of the no-change letter. It was reasonable for petitioner to rely on the no-change letter as

an indication of respondent's agreement that he continued to be engaged in a trade or business, see <u>Matthews v. Commissioner</u>, 92 T.C. 351, 363 (1989) affd. 907 F.2d 1173 (D.C. Cir. 1990), even though the letter does not require the conclusion that he was so engaged. See <u>infra</u> note 12, appendix.

Accordingly, we decline to sustain the imposition of any penalty under section 6662(a), (b), and (c).

To reflect the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155.</u>

Appendix

The Federal Rules of Evidence generally apply to proceedings in this Court. Sec. 7453; <u>Estate of Shafer v. Commissioner</u>, 80 T.C. 1145, 1151 (1983), affd. 749 F.2d 1216 (6th Cir. 1984).

<u>Issue (a). Exhibits 6 and 7, Income Tax Examination Changes and No-Change Letter For 1989</u>

Respondent objects to the admission of the 1989 income tax examination report and no-change letter. Citing <u>Gordon v. Commissioner</u>, 63 T.C. 51, 78 (1974), respondent maintains that the fact that there was no change to petitioner's 1989 reported income is irrelevant to the issues in this case. We disagree.

Rule 401 of the Federal Rules of Evidence provides that a statement is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." In <u>Gordon</u>, we agreed with the Commissioner that the amount of unreported wagering income determined by the Commissioner in a specific year was not dependent upon the taxpayer's activities in earlier years. While the years at issue in the case at hand are 1986 and 1991, we also consider petitioner's activities during the intervening years to determine whether petitioner carried on a trade or business in 1991.

Petitioner claimed deductions in 1989 for depreciation and other expenses related to his drilling operation. Respondent, after audit, concluded that petitioner's return for the tax year 1989 should be accepted with no change in the reported taxable income for that year. Respondent's concession is an admission that has a tendency to show that petitioner was engaged in a trade or business in 1989. Exhibits 6 and 7 are relevant to whether petitioner was engaged in a trade or business in 1991.[12]

Issue (b). Exhibits 8 and 9, Income Tax Examination and Report for 1991

Respondent objects to the admission of the 1991 income tax examination and report. Respondent relies on Dellacroce v. Commissioner, 83 T.C. 269, 280 (1984), and Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327 (1974), for the proposition that the Tax Court generally does not look behind the statutory notice of deficiency to examine the basis of the Commissioner's determination. Petitioner asserts that Exhibits 8

---

[12]We should note that the no-change letter issued by respondent for the tax year 1989 is not controlling evidence that petitioner was engaged in a trade or business in that year. For respondent's no-change letter to be binding, petitioner must show the elements of estoppel, Fitzpatrick v. Commissioner, T.C. Memo. 1995-548, or that the no-change letter amounted to a closing agreement. Respondent's audit and resulting no-change letter occurred in 1992, after the relevant period. Thus, petitioner could not have detrimentally relied on the no-change letter, a key condition which a taxpayer claiming estoppel against the Government must satisfy, Boulez v. Commissioner, 76 T.C. 209, 215 (1981) affd. 810 F.2d 209 (D.C. Cir. 1987), in continuing his drilling activity. However, we have taken the letter into account in assessing the reasonableness of petitioner's return position for the purpose of the sec. 6662 penalty.

and 9 explain why adjustments were made with respect to petitioner's tax liability for 1991, and how respondent calculated the deficiency at issue.

We agree with respondent. A trial before the Tax Court is a proceeding de novo. Greenberg's Express, Inc. v. Commissioner, supra at 328. Our decision in this case must be based on the record of the case, not the record developed at the administrative level. See O'Dwyer v. Commissioner, 28 T.C. 698, 702-704 (1957), affd. 266 F.2d 575, 581 (4th Cir. 1959). Inasmuch as petitioner has not shown that respondent's deficiency determination was arbitrary and erroneous, or that the determination was not supported by the proper foundation evidence, see Weimerskirch v. Commissioner, 596 F.2d 358, 362 (9th Cir. 1979) revg. 67 T.C. 672 (1977), it is inappropriate for us to look behind the deficiency notice to examine the basis for respondent's determination.

Issue (c). Exhibit 10, IRS Settlement Proposal

Respondent objects to the admission of an offer in settlement sent by an IRS Appeals officer to petitioner. Rule 408 of the Federal Rules of Evidence renders inadmissible any evidence of conduct or statements made in negotiations to compromise a claim. Petitioner relies on the third sentence of Rule 408, which provides that the rule does not require "the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." There

is nothing in respondent's settlement offer that was "otherwise discoverable" within the meaning of rule 408.  We agree with respondent and have not considered the Appeals officer's settlement proposal for any purpose.

Issue (d).  Exhibits J and K, Petitioner's 1992 and 1993 Tax Returns

Petitioner objects, on the ground of lack of relevance, to the admission of his 1992 and 1993 Federal income tax returns. Respondent maintains that petitioner's returns for the years 1992 and 1993 are evidence that petitioner is still earning no revenue from his drilling activity.  This, respondent argues, is relevant to the determination of whether petitioner carried on a trade or business.  Petitioner maintains that the years covered in this case include years prior to 1992, and evidence relating to whether he maintained a trade or business should be limited to those years.

We agree with respondent.  The tax years before this Court are 1986 and 1991.  Respondent seeks admission of the 1992 and 1993 tax returns for the purpose of showing that De Boer Drilling Co. continued to earn no revenue.  This evidence is relevant to whether petitioner was engaged in a trade or business in 1991, the immediately preceding year.